## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SAMANTHA SIMMONS, ANSLEIGH WALTERS, MARYKAY THROWER, JACKIE SPIVEY, LAURA MARTSON, and CHRISSIE HUMENNY, Individually and on Behalf of All Others Similarly Situated,<br><br>　　　　　Plaintiff,<br>v.<br><br>UNILEVER UNITED STATES INC.,<br><br>　　　Defendant. | Case No.:　3:22-cv-23376<br><br>**CLASS ACTION COMPLAINT FOR:**<br><br>1. VIOLATION OF THE FLORIDA'S UNFAIR AND DECEPTIVE TRADE PRACTICES ACT;<br>2. NEGLIGENT MISREPRESENTATION/OMISSION<br>3. STRICT LIABILITY-FAILURE TO WARN;<br>4. STRICT LIABILITY-MANUFACTURING DEFECT<br><br>**DEMAND FOR JURY TRIAL** |

## CLASS ACTION COMPLAINT

Plaintiffs, Samantha Simmons, Ansleigh Walters, MaryKay Thrower, Jackie Spivey, Laura Martson, and Chrissie Humenny (collectively "Plaintiffs"), individually and on behalf of all others similarly situated, files this Class Action Complaint ("CAC") against Defendant Unilever United States Incorporated ("Defendant"), and in support states the following:

### NATURE OF THE ACTION

1　　　This is a class action lawsuit by Plaintiffs, and others similarly situated, who purchased and used Dove, Nexxus, Suave, TRESemme, and/or Bed Head dry shampoo or foam shampoo aerosol products. Defendant distributes, markets and sells these products over-the-counter ("OTC") under their various brand names. Defendant's dry shampoo and/or foam

1

shampoo products have been found to be contaminated and/or adulterated with benzene, a known human carcinogen, resulting in a nationwide product recall. The presence of benzene in Defendant's products was not disclosed in the products' label other otherwise made known to consumers, in violation of Florida law and other the putative class representatives' states' laws. Plaintiffs and the putative class suffered economic damages due to Defendant's misconduct (as set forth below) and they seek, among other things, injunctive relief and restitution for the full purchase price of the product(s) they purchased. Plaintiffs allege the following based upon personal knowledge as well as investigation by counsel, and as to all other matters, upon information and belief. Plaintiffs further believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## JURISDICTION AND VENUE

2.      This Court has original jurisdiction over all causes of action asserted herein under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds the sum or value of $5,000,000 exclusive of interest and costs and is a class action in which there are more than 100 class members and many members of the class are citizens of a state different than Defendant.

3.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391, because Plaintiff Samantha Simmons suffered injury as a result of Defendant's acts in this district, many of the acts and transactions giving rise to this action occurred in this district, Defendant conducts substantial business in this district, Defendant has intentionally availed itself of the laws and markets of this district, and Defendant is subject to personal jurisdiction in this district.

## THE PARTIES

4.    Plaintiff Samantha Simmons resides in Escambia County, Florida, and at all times relevant hereto has been a resident of Escambia County. Within the class period, and prior to October 2021, Plaintiff purchased and used numerous dry shampoo products impacted by Defendant's recall, including Dove Dry Shampoo Fresh Coconut, which she purchased in Escambia County. As a disposable consumer good, Plaintiff would use the dry shampoo products she purchased and discard the empty containers after use.  When purchasing the products, Plaintiff read and reviewed the accompanying labels and disclosures, as well as Defendant's advertising claims, and understood them as representations and warranties by the manufacturer that the products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the Products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that any amount of benzene was or risked being contained in the products she purchased, she would not have purchased and used the products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for dry shampoo products that contained or were at risk of containing the carcinogen benzene. As a result, Plaintiff suffered injury in fact when she spent money to purchase dry shampoo products she would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as alleged herein. Moreover, the decision to purchase or not purchase dry shampoo or foam shampoo products that contain or may contain benzene at any level is a financial and healthcare decision that affects Plaintiff in a very personal and individual way, thus conferring a particularized injury. By failing to disclose the presence of benzene or the risk of benzene contamination in its products' labels and advertising and marketing material, Plaintiff has been

3

denied the opportunity to make those informed financial and healthcare decisions. As a result, Plaintiff has Article III standing.

5.     Plaintiff Ansleigh Walters resides in Lee County, Alabama, and at all times relevant hereto has been a resident of Lee County. Within the class period, and prior to October 2021, Plaintiff purchased and used numerous products impacted by Defendant's recall, including Nexxus dry shampoo, which she purchased in Lee County. As a disposable consumer good, Plaintiff would use the dry shampoo products she purchased and discard the empty containers after use.  When purchasing the products, Plaintiff read and reviewed the accompanying labels and disclosures, as well as Defendant's advertising claims, and understood them as representations and warranties by the manufacturer that the products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that any amount of benzene was or risked being contained in the products she purchased, she would not have purchased and used the products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for dry shampoo products that contained or were at risk of containing the carcinogen benzene. As a result, Plaintiff suffered injury in fact when she spent money to purchase dry shampoo products she would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as alleged herein. Moreover, the decision to purchase or not purchase dry shampoo or foam shampoo products that contain or may contain benzene at any level is a financial and healthcare decision that affects Plaintiff in a very personal and individual way, thus conferring a particularized injury. By failing to disclose the presence of benzene or the risk of benzene

contamination in its products' labels and advertising and marketing material, Plaintiff has been denied the opportunity to make those informed financial and healthcare decisions. As a result, Plaintiff has Article III standing.

6.    Plaintiff MaryKay Thrower resides in Fairfield County, Connecticut, and at all times relevant hereto has been a resident of Fairfield County. Within the class period, and prior to October 2021, Plaintiff purchased and used numerous dry shampoo products impacted by Defendant's recall, including Suave dry shampoo and Dove dry shampoo, which she purchased in Fairfield County. As a disposable consumer good, Plaintiff would use the dry shampoo products she purchased and discard the empty containers after use.  When purchasing the products, Plaintiff read and reviewed the accompanying labels and disclosures, as well as Defendant's advertising claims, and understood them as representations and warranties by the manufacturer that the products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that any amount of benzene was or risked being contained in the products she purchased, she would not have purchased and used the products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for dry shampoo products that contained or were at risk of containing the carcinogen benzene. As a result, Plaintiff suffered injury in fact when she spent money to purchase dry shampoo products she would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as alleged herein. Moreover, the decision to purchase or not purchase dry shampoo or foam shampoo products that contain or may contain benzene at any level is a financial and healthcare decision that affects Plaintiff in a very personal and individual

way, thus conferring a particularized injury. By failing to disclose the presence of benzene or the risk of benzene contamination in its products' labels and advertising and marketing material, Plaintiff has been denied the opportunity to make those informed financial and healthcare decisions. As a result, Plaintiff has Article III standing.

7.    Plaintiff Jackie Spivey resides in Coffee County, Georgia, and at all times relevant hereto has been a resident of Coffee County. Within the class period, and prior to October 2021, Plaintiff purchased and used numerous dry shampoo products impacted by Defendant's recall, including Suave dry shampoo and Dove dry shampoo, which she purchased in Coffee County. As a disposable consumer good, Plaintiff would use the dry shampoo products she purchased and discard the empty containers after use.  When purchasing the products, Plaintiff read and reviewed the accompanying labels and disclosures, as well as Defendant's advertising claims, and understood them as representations and warranties by the manufacturer that the products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that any amount of benzene was or risked being contained in the products she purchased, she would not have purchased and used the products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for dry shampoo products that contained or were at risk of containing the carcinogen benzene. As a result, Plaintiff suffered injury in fact when she spent money to purchase dry shampoo products she would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as alleged herein. Moreover, the decision to purchase or not purchase dry shampoo or foam shampoo products that contain or may contain benzene at any level is a financial and

healthcare decision that affects Plaintiff in a very personal and individual way, thus conferring a particularized injury. By failing to disclose the presence of benzene or the risk of benzene contamination in its products' labels and advertising and marketing material, Plaintiff has been denied the opportunity to make those informed financial and healthcare decisions. As a result, Plaintiff has Article III standing.

8.    Plaintiff Laura Martson resides in Wake County, North Carolina, and at all times relevant hereto has been a resident of Wake County. Within the class period, and prior to October 2021, Plaintiff purchased and used numerous dry shampoo products impacted by Defendant's recall, including Nexxus dry shampoo and TRESemme dry shampoo, which she purchased in Wake County. As a disposable consumer good, Plaintiff would use the dry shampoo products she purchased and discard the empty containers after use.  When purchasing the products, Plaintiff read and reviewed the accompanying labels and disclosures, as well as Defendant's advertising claims, and understood them as representations and warranties by the manufacturer that the products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that any amount of benzene was or risked being contained in the products she purchased, she would not have purchased and used the products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for dry shampoo products that contained or were at risk of containing the carcinogen benzene. As a result, Plaintiff suffered injury in fact when she spent money to purchase dry shampoo products she would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as alleged herein. Moreover, the decision to purchase or

not purchase dry shampoo or foam shampoo products that contain or may contain benzene at any level is a financial and healthcare decision that affects Plaintiff in a very personal and individual way, thus conferring a particularized injury. By failing to disclose the presence of benzene or the risk of benzene contamination in its products' labels and advertising and marketing material, Plaintiff has been denied the opportunity to make those informed financial and healthcare decisions. As a result, Plaintiff has Article III standing.

9.    Plaintiff Chrissie Humenny resides in Harris County, Texas, and at all times relevant hereto has been a resident of Harris County. Within the class period, and prior to October 2021, Plaintiff purchased and used dry shampoo products impacted by Defendant's recall, including Nexxus dry shampoo, which she purchased in Harris County. As a disposable consumer good, Plaintiff would use the dry shampoo products she purchased and discard the empty containers after use.  When purchasing the products, Plaintiff read and reviewed the accompanying labels and disclosures, as well as Defendant's advertising claims, and understood them as representations and warranties by the manufacturer that the products were properly manufactured, free from defects, safe for their intended use, and not adulterated or misbranded. Plaintiff relied on these representations and warranties in deciding to purchase the products manufactured by Defendant, and these representations and warranties were part of the basis of the bargain. Had Plaintiff known that any amount of benzene was or risked being contained in the products she purchased, she would not have purchased and used the products at all or would have paid significantly less for them. Plaintiff would have never paid a premium for dry shampoo products that contained or were at risk of containing the carcinogen benzene. As a result, Plaintiff suffered injury in fact when she spent money to purchase dry shampoo products she would not otherwise have purchased, or paid less for, absent Defendant's misconduct, as

alleged herein. Moreover, the decision to purchase or not purchase dry shampoo or foam shampoo products that contain or may contain benzene at any level is a financial and healthcare decision that affects Plaintiff in a very personal and individual way, thus conferring a particularized injury. By failing to disclose the presence of benzene or the risk of benzene contamination in its products' labels and advertising and marketing material, Plaintiff has been denied the opportunity to make those informed financial and healthcare decisions. As a result, Plaintiff has Article III standing.

10.     Defendant Unilever United Stated Inc. is a subsidiary of the dual-listed company consisting of Unilever N.V. in Rotterdam, Netherlands and Unilever PLC in London, United Kingdom. Unilever United States, Inc., with its principal place of business located at 800 Sylvan Avenue, Englewood Cliffs, New Jersey 07632. Defendant manufactured, marketed, designed, promoted and/or distributed the Products at issue.

## INTRODUCTION

11.     Around 2020, Valisure LLC and ValisureRX LLC ("Valisure"), an analytical pharmacy, ran tests on dozens of manufacturers' sunscreen products, primarily aerosol products. Through its testing, Valisure discovered that certain aerosol sunscreen products contained benzene, a known human carcinogen, with values ranging from less than 0.1 parts per million ("ppm"); to 0.10 ppm to 2 ppm, to more than 2 ppm.[1]

12.     Based on its findings, on May 25, 2021, Valisure filed a Citizen Petition with the Food and Drug Administration ("FDA") asking the agency to recall all batches of sunscreen

---

[1] https://assets-global.website-files.com/6215052733f8bb8fea016220/62728f83d7f91acc8572e9ee_FDA-2021-P-0497-0001_attachment_1.pdf

products that contained 0.1 ppm or more of benzene, on the basis that they are adulterated under federal law and values above 0.1 ppm pose known risks to human health..[2] At that time, Valisure advised the FDA, as well as the aerosol manufacturing community, that "the presence of benzene appears to be from contamination in the identified sunscreen products." *Id*.

13.    After Valisure's Citizen Petition was filed in May 2021, litigation related to benzene contamination in sunscreen began immediately, including against Defendant's competitor Johnson & Johnson ("J&J"). J&J began an internal investigation, and quickly revealed that the source of its products' benzene contamination was the propellant that sprays the product out of the can. Less than two months later, on July 14, 2021, J&J announced it was voluntarily recalling all lots of Neutrogena and Aveeno aerosol sunscreen product lines due to the presence of benzene in samples of the recalled products.[3]

14.    Also in July 2021, Valisure's CEO stated in an interview that the root cause of the benzene contamination would likely be traced to contaminated raw materials, and that he did not believe that the problem was limited to aerosol sunscreens, or sunscreens in general,[4] thus again putting all aerosol manufacturers on notice that the benzene contamination issue was likely a much broader.

15.    On November 3, 2021, Valisure filed another Citizen Petition with the FDA—this time to address benzene contamination in various manufacturers' antiperspirant and deodorant products, including Defendant's aerosol products. Through its testing, Valisure discovered that some of the Defendant's aerosol antiperspirant products contained benzene, with values ranging

---

[2] *Id*.
[3] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/johnson-johnson-consumer-inc-issues-voluntary-recall-specific-neutrogenar-and-aveenor-aerosol.
[4] https://www.reuters.com/world/us/fda-investigating-how-known-carcinogen-wound-up-jj-sunscreen-2021-07-16/.

from 0.97 parts per million ("ppm") to 5.21 ppm in Suave 24 Hour Protection aerosols.[5] Valisure found that products containing butane were at higher risk of having elevated benzene levels and warned that "'propellants' like butane, isobutane, propane, and alcohol are commonly used and could potentially be sources of benzene contamination."[6]

16.     By December 2021, the FDA was likewise advising manufacturers to test for benzene contamination, indicating that the cause of benzene contamination may be related to the propellant isobutane.[7]

17.     At some undisclosed point in time, Defendant initiated an "internal review" of its products for the presence of benzene. Based on that review, on March 30, 2022, Defendant announced it was voluntarily recalling two Suave 24-Hour Protection aerosol antiperspirants due to "unexpected," "elevated levels of benzene" in those products.[8] Defendant's "internal review" showed that "some samples" of the two antiperspirants contained benzene that "came from the propellant" used in manufacturing the antiperspirants. [9]  Upon information and belief, the source of Defendant's contamination and ensuing recall in March 2022 was the same propellant that resulted in J&J's recall over 9 months earlier. In its recall announcement, however, Defendant does not disclose how many products it tested or what levels of benzene was detected in those products.

---

[5] https://assets-global.website-files.com/6215052733f8bb8fea016220/626af96f521a0584e70e50eb_Valisure%20FDA%20Citizen%20Petition%20on%20Body%20Spray%20v4.0%5B260%5D.pdf.
[6] https://www.valisure.com/valisure-newsroom/valisure-detects-benzene-in-body-spray-products.
[7] https://www.bostonglobe.com/2021/12/23/business/fda-tells-drugmakers-test-benzene-contamination/.
[8] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-nationwide-recall-suave-24-hour-protection-aerosol-antiperspirant-powder.
[9] *Id*.

18.     On October 18, 2022, almost 1 ½ years after Valisure's initial disclosure of benzene contamination in dozens of aerosol sunscreen products, Defendant issued a second nationwide recall of 19 dry shampoo and foam shampoo aerosol products produced prior to October 2021—again due to benzene contamination.  In its recall notice, Defendant acknowledges the inherent health risk of benzene exposure: "Exposure to benzene can occur by inhalation, orally, and through the skin and it can result in cancers including leukemia and blood cancer of the bone marrow and blood disorders which can be life threatening." As with its March 2022 recall, Defendant stated an "internal investigation" had "identified the propellant as the source" of the benzene contamination, and further claimed it had "worked with its propellant suppliers to address this issue."[10] The Products impacted by the October 2022 recall are the following:

**Dove**
Dove Dry Shampoo Volume and Fullness
Dove Dry Shampoo Fresh Coconut
Dove Dry Shampoo Fresh and Floral
Dove Dry Shampoo Ultra Clean
Dove Dry Shampoo Invisible
Dove Dry Shampoo Detox and Purify
Dove Dry Shampoo Clarifying Charcoal
Dove Dry Shampoo Go Active

**Nexxus**
Nexxus Dry Shampoo Refreshing Mist
Nexxus Inergy Foam Shampoo

**Suave**
Suave Dry Shampoo Hair Refresher
Suave Professionals Dry Shampoo Refresh and Revive

**TRESemmé**
TRESemmé Dry Shampoo Volumizing
TRESemmé Dry Shampoo Fresh and Clean

---

[10] https://www.unileverusa.com/news/press-releases/2022/unilever-issues-voluntary-us-recall-of-select-dry-shampoos-due-to-potential-presence-of-benzene/.

TRESemmé Pro Pure Dry Shampoo

**Bed Head**
Bed Head Oh Bee Hive Dry Shampoo
Bed Head Oh Bee Hive Volumizing Dry Shampoo
Bed Head Dirty Secret Dry Shampoo

**Rockaholic**
Bed Head Rockaholic Dirty Secret Dry Shampoo (collectively referred to as "Products").

19.    Defendant knew or should have known of the Products' benzene contamination well before the October 2022 recall. Defendant was required to subject the Products to rigorous quality assurance by Defendant's internal guidelines and applicable laws and regulations. If Defendant had actual knowledge that there was a risk the Products could be contaminated with benzene prior to the October 2022 recall, the company had an obligation to ameliorate and disclose that risk to consumers. If Defendant did not have actual knowledge that the Products could be contaminated with benzene prior to the October 2022 recall, Defendant was reckless and/or negligent as a sophisticated producer of personal care products.

20.    Defendant knew or should have known of the Products' benzene contamination well before the October 2022 recall. Defendant was required to subject the Products to rigorous quality assurance by Defendant's own internal guidelines and applicable laws and regulations. *See* 21 CFR 211.84 (representative samples of each shipment of each lot shall be collected for testing of active and inactive components (or raw materials) to ensure compliance with all established specifications). If Defendant had actual knowledge that there was a risk the Products could be contaminated with benzene prior to the October 2022 recall, the company had an obligation to ameliorate and disclose that risk to consumers. If Defendant did not have actual knowledge that the Products could be contaminated with benzene prior to the October 2022

recall, Defendant was reckless and/or negligent as a sophisticated producer of personal care products.

21.     Upon information and belief, to the extent Defendant disclaimed knowledge of the Products' benzene contamination prior to the October 2022 recall, the company gained actual knowledge of that risk at least as early as July 2021. Around that time, Defendant's top competitors began recalling aerosol products due to the presence of benzene and faced litigation based on those recalls. Valisure's CEO was likewise warning at that time that the benzene contamination would likely be traced to contaminated raw materials. Moreover, in November 2021, Valisure had confirmed the presence of benzene in dozens of aerosol antiperspirants, including in two of Defendant's Suave antiperspirants. Defendant ultimately faced numerous lawsuits arising from the Suave contamination beginning in late 2021.

22.     Despite Defendant's knowledge of the pervasive risk of benzene contamination in the Products, Defendant failed to warn consumers of this known danger until October 18, 2022. Instead, Defendant chose to maximize its profits and delay the costs of immediately recalling the defective products (as its own internal "Governance policy" requires)[11] it sold at the expense of its trusting customers who were unwittingly increasing their exposure to benzene contamination in the Products and continued to buy the Products. Consumers, like Plaintiffs, depended on Defendant to disclose those risks but were, instead, presented with false, misleading, or incomplete representations regarding the safety and benefits of the Products and suffered damages as a result.

---

[11] https://www.unilever.com/planet-and-society/responsible-business/business-integrity/.

## BACKGROUND ON BENZENE

23.    Benzene is used primarily in the chemical and pharmaceutical industries, as a starting material and intermediate in the synthesis of numerous chemicals, and in gasoline. The major United States source of benzene is petroleum. The health hazards of benzene have been recognized for over one hundred years. Benzene was "[f]irst evaluated by IARC in 1974 . . . and was found to be carcinogenic to humans (Group 1), a finding that has stood since that time."[12] As noted by the IARC:

> In the current evaluation, the Working Group again confirmed the carcinogenicity of benzene based on *sufficient evidence* of carcinogenicity in humans, *sufficient evidence* of carcinogenicity in experimental animals, and *strong* mechanistic evidence. … The Working Group affirmed the strong evidence that benzene is genotoxic, and found that it also exhibits many other key characteristics of carcinogens, including in exposed humans. In particular, benzene is metabolically activated to electrophilic metabolites; induces oxidative stress and associated oxidative damage to DNA; is genotoxic; alters DNA repair or causes genomic instability; is immunosuppressive; alters cell proliferation, cell death, or nutrient supply; and modulates receptor-mediated effects.[13]

24.    The Food and Drug Administration ("FDA") similarly recognizes that "[b]enzene is a carcinogen that can cause cancer in humans"[14] and classifies benzene as a "Class 1" solvent that should be "avoided."[15] And the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to

---

[12] Benzene / IARC Working Group on the Evaluation of Carcinogenic Risks to Humans (2017: Lyon, France), at p. 33.
[13] *Id*. at 34.
[14] https://www.fda.gov/food/chemicals/questions-and-answers-occurrence-benzene-soft-drinksand-other-beverages#q1.
[15] https://www.fda.gov/media/71737/download.

benzene at concentrations of 0.1 ppm and defines "skin absorption" as an exposure route.[16] According to the National Toxicology Program ("NTP"), benzene is "*known to be a human carcinogen* based on sufficient evidence of carcinogenicity from studies in humans."[17]

25.     "Even in trace amounts, benzene is known to pose a health risk from exposure routes that include inhalation, ingestion, dermal absorption, and skin or eye contact."[18]

26.     FDA's Guidance for Industry Q3C provides that "Solvents in Class 1 [i.e. benzene] . . . should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicities or deleterious environmental effect."13 That provision provides in full:

> III. SOLVENTS GROUPED BY CLASS Solvents in Class 1 [i.e. benzene] should not be employed in the manufacture of drug substances, excipients, and drug products because of their unacceptable toxicity or their deleterious environmental effect. However, if their use is unavoidable in order to produce a drug product with a significant therapeutic advance, then their levels should be restricted … [to 2 ppm], unless otherwise justified.[19]

27.     Thus, although benzene should not be employed in the manufacture of drug substances, it may be used in manufacturing *some* drug substances when (1) its use is "unavoidable" to produce a drug product with (2) "significant therapeutic advance." Defendant's Products do not meet this safe harbor exception. This is because the use of benzene in the manufacture of the Products is not "unavoidable," nor does the use of benzene in the Products provide a "significant therapeutic advance."

---

[16] Centers for Disease Control and Prevention. *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (https://www.cdc.gov/niosh/npg/npgd0049.html).
[17] http://ntp.niehs.nih.gov/go/roc/content/profiles/benzene.pdf (emphasis added).
[18] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.
[19] Food and Drug Administration, Q3C – Tables and List Guidance for Industry (2017) (https://www.fda.gov/media/71737/download).

28.     That the use of benzene is entirely avoidable is illustrated by Valisure's testing, which showed variation of benzene contamination in the batches of dry shampoos tested. Some of the dry shampoo products tested by Valisure contained detectible and/or or elevated levels of benzene and some did not. It is also illustrated in Defendant's October 2022 recall notice, wherein the company recalled only "select lots of dry shampoo aerosol products produced prior to October 2021,"[20] implying that other lots of Defendant's dry shampoo products are benzene-free.

29.     First, the use of benzene in making the Products is not "unavoidable" because some of the manufacturer's dry shampoo products tested by Valisure did not contain detectable levels of benzene while some did. *See* Ex. A. (Valisure Citizen Petition). Given that benzene was detected by Valisure in some manufacturer's products but not in others is evidence in itself that benzene is not required in its manufacture. Second, the Products do not represent a "significant therapeutic advance." Indeed, the FDA has never considered dry shampoo or foam shampoo products as representing a "significant therapeutic advance." Moreover, considering the long history and widespread use of dry shampoo and foam shampoo products, it does not appear that such products constitute a significant therapeutic advance.

30.     Following Valisure's May 2021 Citizen Petition, the FDA has been working with drug and cosmetic manufacturers on the specific issue of benzene contamination. This work has resulted in the agency issuing an FDA Alert *reminding* manufacturers that they "should not use benzene in the manufacture of drugs."[21] The agency has also worked with numerous

---

[20] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/unilever-issues-voluntary-us-recall-select-dry-shampoos-due-potential-presence-benzene.

[21] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022).

manufacturers, including Defendant, over the past 1 ½ years to recall various aerosol products contaminated with benzene.[22] The FDA's most recent Alert, published June 9, 2022, reaffirms the agency's long-standing position with respect to benzene in drug and cosmetic products, stating that "manufacturers should avoid using benzene in the manufacturing process."[23] The Alert further notes that this prohibition is consistent with the agency's 2017 guidance document: "Consistent with the recommendations of the ICH Q3 guidance, manufacturers should not use benzene in the manufacture of drugs."[24]

31.    Benzene is not listed as an active or inactive ingredient (or otherwise identified as being present) on any of the labels of Defendant's Products. Neither is the use of benzene as an undisclosed "residual solvent" authorized by FDA.[25] This because, as noted above, its use is not "unavoidable"  and its use in the Products does not constitute a "significant therapeutic advance." Simply put, benzene is not, and never has been, "authorized" by FDA for use in the manufacture of the Products, either as an ingredient, active ingredient, or residual solvent.

32.    Similar to FDA's Guidance for Industry Q3C, the FDA's Residual Solvent Guidance on the use of "residual solvents" for drug products (USP General Chapter) provides that because Class 1 cancer causing agents (like benzene) do not "provide therapeutic benefit," they should be "avoided" absent a showing that their use is "strongly justified" in a risk-benefit analysis. General Chapter 467 provides:

---

[22] To date, there have been 11 recalls of products due to the benzene contamination.
[23] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022).
[24] https://www.fda.gov/drugs/pharmaceutical-quality-resources/fda-alerts-drug-manufacturers-risk-benzene-contamination-certain-drugs (June 9, 2022); Food and Drug Administration, *Q3C – Tables and List Guidance for Industry* (2017) (https://www.fda.gov/media/71737/download).
[25] *See* Residual Solvent Guidance, "Residual Solvents in Drug Products Marketed in the United States" (2009) (applying standards in USP General Chapter Residual Solvents).

Because residual solvents do not provide therapeutic benefit, they should be removed, to the extent possible, to meet ingredient and product specifications, good manufacturing practices, or other quality-based requirements. Drug products should contain no higher levels of residual solvents than can be supported by safety data. Solvents that are known to cause unacceptable toxicities (Class 1, Table 1) [e.g., benzene] should be avoided in the production of drug substances, excipients, or drug products unless their use can be strongly justified in a risk-benefit assessment.[26]

33.     Upon information and belief, Defendant has never conducted a "risk benefit assessment" regarding the use of benzene as a residual solvent in its Products, much less "strongly justified" its use before the FDA. Nor is the use of benzene as a residual solvent in manufacturing aerosol antiperspirant products "supported by the safety data" in light of the known health risks associated with exposure to benzene as detailed herein.

34.     The FDCA defines "cosmetics" by their intended use, as "articles intended to be rubbed, poured, sprinkled, or sprayed on, introduced into, or otherwise applied to the human body...for cleansing, beautifying, promoting attractiveness, or altering the appearance[.]" Federal Food, Drug, and Cosmetic Act § 201(i). "Cosmetic companies have a legal responsibility for the safety of their products and ingredients."[27]

35.     Federal law and Florida law contain parallel statutes with respect to the misbranding and adulteration of cosmetics. Both laws prohibit the same action, the sale of cosmetics that are misbranded and dangerous.

36.     The manufacture of any misbranded or adulterated cosmetic is prohibited under

---

[26] https://www.uspnf.com/sites/default/files/usp_pdf/EN/USPNF/generalChapter467Current.pdf (USP General Chapter Residual Solvents).
[27] https://www.fda.gov/cosmetics/resources-consumers-cosmetics/cosmetics-safety-qa-personal-care-products.

federal [28] and Florida law.[29]

37.    The manufacture within any Territory of any cosmetic that is adulterated or misbranded is prohibited.[30]

38.    The adulteration or misbranding of any cosmetic in interstate commerce is prohibited.[31]

39.    The introduction into commerce of any misbranded or adulterated cosmetic is similarly prohibited.[32]

40.    The receipt in interstate commerce of any adulterated or misbranded cosmetic is also unlawful.[33]

41.    Among the ways a cosmetic may be adulterated are:

> (1) If it bears or contains any poisonous or deleterious substance that is injurious to users under the conditions of use prescribed in the labeling or advertisement thereof or under such conditions of use as are customary or usual[;]
> (2)  If it consists in whole or in part of any filthy, putrid, or decomposed substance[;]
> (3) If it has been produced, prepared, packed, or held under conditions whereby it could have become contaminated with filth or whereby it could have been rendered injurious to health.[34]

---

[28] 21 U.S.C. §331(g).

[29] *See* Fla. Stat. § 499.005(1) ("It is unlawful for a person to perform or cause the performance of any of the following acts in this state: (1) The manufacture, repackaging, sale, delivery, or holding or offering for sale of any drug, device, or cosmetic that is adulterated or misbranded or has otherwise been rendered unfit for human or animal use.").

[30] 21 U.S.C. §331(a); Fla. Stat. § 499.005(1).

[31] 21 U.S.C. §331(b); Fla. Stat. § 499.005(2).

[32] 21 U.S.C. §331(a); Fla. Stat. § 499.005(1).

[33] 21 U.S.C. §331(c); *see also* Fla. Stat. § 499.005(3)("It is unlawful for a person to perform or cause the performance of any of the following acts in this state: … (3) The receipt of any drug, device, or cosmetic that is adulterated or misbranded, and the delivery or proffered delivery of such drug, device, or cosmetic, for pay or otherwise.").

[34]Fla. Stat. § 499.008(1)-(3); 21 U.S.C. §362(a) (cosmetic).

42. A cosmetic is misbranded "[i]f its labeling is false or misleading in any particular.[35]

43. Defendant did not disclose benzene, a known human carcinogen, is present in the Products purchased by Plaintiffs and the putative class members. As a result of benzene contamination in the Products, they are considered adulterated and misbranded. There is no "no safe level of benzene" exposure in cosmetics, so it is unsuitable for human application as a dry shampoo or foam shampoo.[36]

44. Defendant wrongfully advertised and sold the Products without any labeling to indicate to consumers that the Products contain benzene. The following image is illustrative of the labels contained on the Products purchased by Plaintiffs and the class members:

---

[35] Fla. Stat. § 499.007(1); 21 U.S.C. §362(a) (cosmetic).
[36] https://www.who.int/ipcs/features/benzene.pdf.





45.     Further, Florida law specifically provides that a cosmetic is adulterated "[i]f it consists in whole or in part of any filthy, putrid or decomposed substance" (Fla. Stat. § 499.008(2) or "contains any poisonous or deleterious substance that is injurious to users under the conditions of use prescribed in the labeling or advertisement thereof, or under such conditions of use as are customary or usual . . . . Fla. Stat. § 499.008(1) (emphasis added). Here, the Products violate both provisions in that they (1) consist of a filthy or putrid substance (i.e. benzene) and (2) contain a poisonous or deleterious substance (i.e. benzene) that could be injurious to users under the conditions of use prescribed.[37]

---

[37] https://www.who.int/ipcs/features/benzene.pdf. (World Health Organization noting that "[b]enzene is carcinogenic to humans, and no safe level of benzene can be recommended.")

23

46.    In addition, Defendant makes a significant number of representations and/or warranties regarding the safety of the Products on its various websites. For example, Unilever assures consumers that (1) "[w]e design and manufacture our products so they're safe for their intended use"[38]; (2) it abides by "innovating responsibility, [which] means providing branded products and services that are safe and high quality, and innovating based on sound science"[39]; (3) it has "mandatory policies and standards in place to ensure that we meet our safety and quality commitments"[40]; (4) "we design safety and sustainability into our products and manufacturing processes using the best science available"[41]; (5) "[t]o keep people safe, we conduct two types of consumer safety risk assessment: ingredient safety and microbiological safety"[42]; (6) it "ensure[s] we deliver high-quality, safe and sustainable products every single day to our customers"[43]; (7) "[w]e want consumers to be confident that our products are safe for them and their families"[44]; (8) "we build safety and environmental sustainability into every product innovation"[45]; (9) "[w]e ensure that our products are safe for consumers"[46]; (10) it

---

[38] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.

[39] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.

[40] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.

[41] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.

[42] https://www.unilever.com/planet-and-society/safety-and-environment/keeping-people-and-theenvironment-safe/ (last visited Nov. 10, 2021).

[43] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.

[44] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.

[45] https://www.unilever.com/planet-and-society/safety-and-environment/safe-and-sustainable-by-design/.

[46] https://www.unilever.com/planet-and-society/safety-and-environment/safe-and-sustainable-by-design/.

incorporates "leading-edge science . . . to truly design safety and sustainability into our products"[47]; (11) "Unilever products and processes are always designed to ensure that they are safe for our consumers to use"[48]; and (12) it "provid[es] safe high quality products . . . that meet all applicable standards and regulation."[49]

47.     Plaintiff and members of the putative Florida Sub-Class read and relied on one or more of the aforementioned representations in deciding to purchase and use the Products. Plaintiffs would not have purchased the Products, or paid less for them, had they known that these claims were false and misleading.

48.     Similarly, Plaintiff and members of the putative Florida Sub-Class read and relied on the Products' labels in deciding to purchase and use the Products. Defendant's omission of the presence of, or risk of presence of, benzene on the labels was a material factor in influencing Plaintiffs' decision to purchase and use the Products. Plaintiffs would not have purchased and used the Products, or would have paid less for them, had they known that the Products either contain, or have a risk of containing, benzene.

49.     Indeed, no reasonable consumer is going to purchase a dry shampoo product, or, alternatively, pay a premium for it, if he or she cannot know whether the product pulled off the shelf is one that is contaminated with a cancer causing drug. No reasonable consumer is going to play Russian Roulette with dry shampoo or foam shampoo products.

---

[47] https://www.unilever.com/planet-and-society/safety-and-environment/safe-and-sustainable-by-design/.

[48] https://www.unilever.com/planet-and-society/safety-and-environment/safe-and-sustainable-by-design/.

[49] https://www.unilever.com/files/origin/8e705568438b3a2aacb0ca0f6b4166fdbb1b0bd1.pdf/cobp_product-safety-product-quality.pdf/.

50.     The aforementioned representations and omissions are false and/or misleading because nowhere on the Products' labels (or elsewhere in Defendant's marketing of the Products) does Defendant insinuate, state, or warn consumers that the Products contain, or have a risk of containing, benzene.

51.     Moreover, by virtue of issuing a recall of the Products, Defendant concedes that its Products are mislabeled under federal and Florida law, unsafe, and unmerchantable. Defendant represents and/or warrants on its website that:

> Sometimes mistakes can be made in the end-to-end value chain. A product might, for example, have a quality defect. Or there may be a contamination of the raw materials, or a mislabeling of ingredients.
>
> If this happens, protecting consumers' safety is our number one priority. When necessary, we will recall such products from the marketplace.[50]

52.     Thus, by recalling the Products, Defendant admits that it made a "mistake" and that it was "necessary" to recall the Products from the marketplace in order to "protect consumers' safety" due to the contamination of raw materials and/or mislabeling.

53.     Defendant also represents and/or warrants to consumers that it abides by its "Governance policy" with respect to "Product Safety & Product Quality."[51] In doing so, it represents and/or warrants that "Unilever will take prompt and timely action to recall products or services that don't meet our own high quality standards or those required by the marketplace."[52]

---

[50] https://www.unilever.com/planet-and-society/responsible-business/product-safety-and-quality/.

[51] https://www.unilever.com/planet-and-society/responsible-business/business-integrity/.

[52] https://www.unilever.com/files/origin/8e705568438b3a2aacb0ca0f6b4166fdbb1b0bd1.pdf/cobp_product-safety-product-quality.pdf.

Again, by issuing a recall of the Products, Defendant concedes that its Products are not of merchantable quality and do not meet "reasonable consumers'" expectations.

54.    Defendant's conduct is also violative of its representation and/or warranty to take "prompt and timely action to recall" the Products.  Defendant waited 10 months after Valisure's Citizen Petition to issue its first recall related to benzene contamination and 1 ½ years to issue a recall for the Products at issue, even though both recalls were based on the same thing (benzene contamination in aerosol products). By comparison, at least 9 other aerosol manufacturers had already issued voluntarily recalls before Defendant decided to recall the Products at issue, the earliest of which was July 2021.[53]

55.    Plaintiffs have standing to represent members of the putative class with respect to the Products they purchased and the Products they did not purchase because there is sufficient similarity between the Products. Specifically, *all* of the Products are marketed in substantially the same way – as "dry shampoo" and/or "foam shampoo"— and *all* of the Products fail to include labeling indicating to consumers that the Products contain, or may contain, benzene.

---

[53] July 2021 – J&J recalls lots of Neutrogena and Aveeno spray sunscreens.
July 2021 – CVS recalls lots of two sun-care products.
Sept. 2021 -- Biersdorf recalls Pure & Simple Baby, Sport Mineral and Coppertone sprays.
Oct. 2021 -- Bayer recalls Tinactin and Lotrimin antifungal sprays.
Nov. 2021 -- Recall of Odor-Eaters and Stink Stoppers foot sprays.
Nov. 2021 -- Procter & Gamble recalls of Old Spice and Secret antiperspirants.
Dec. 2021 -- P&G recalls Waterless, Pantene, Aussie, Herbal Essences, Old Spice, and Hair Food dry shampoo sprays.
Feb. 2022 -- HRB Brands recalls Sure and Brut sprays.
**Mar. 2022 -- Unilever recalls Suave antiperspirants.**
July 2022 -- Edgewell Personal Care recalls Banana Boat Hair & Scalp sunscreens.
**Oct. 2022 -- Unilever recalls 19 lots of Dove, Nexxus, Suave, TRESemmé, Rockaholic and Bed Head dry shampoos.**

Accordingly, the misleading effect of *all* the Products' marketing and labels are substantially the same.

56.    Had Plaintiffs and members of the putative class known that *any* of the Products were, or could be, contaminated with benzene, they would not have purchased, or would have paid less for, the Products. Thus, Plaintiffs and members of the putative class have "lost money" as a result of Defendant's misrepresentations. Moreover, the decision to purchase or not purchase Products that contain benzene at any level is a financial and healthcare decision that affects the Plaintiffs and members of the putative class in a personal and individual way, thus conferring a particularized injury. By failing to disclose the presence, or potential presence, of benzene in its Products, Plaintiffs and members of the putative class have been denied the opportunity to make those informed decisions. As a result, Plaintiffs and members of the putative class have suffered a particularlized injury for purposes of Article III standing.

## CLASS ALLEGATIONS

57.    Plaintiffs bring this action on behalf of themselves and all other similarly situated class members (hereafter the "Class") pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following class against Defendant for violations of Florida state laws and/or similar laws in other states:

### Nationwide Class

All consumers who purchased any Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo in the United States of America and its territories from November 17, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo Products. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives,

employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

58.     In the alternative, Plaintiffs bring this action on behalf of themselves and all other similarly situated Florida consumers pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Sub-Classes:

**Florida Sub-Class**

All consumers who purchased any Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo in the State of Florida from November 17, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo Products. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

**Alabama Sub-Class**

All consumers who purchased any Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo in the State of Alabama from November 17, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo Products. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

**Connecticut Sub-Class**

All consumers who purchased any Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo in the State of Connecticut from November 17, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo Products. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives,

employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

### Georgia Sub-Class

All consumers who purchased any Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo in the State of Georgia from November 17, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo Products. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

### North Carolina Sub-Class

All consumers who purchased any Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo in the State of North Carolina from November 17, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo Products. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

### Texas Sub-Class

All consumers who purchased any Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo in the State of Texas from November 17, 2018 to the present for personal use or consumption.

Excluded from the Class are individuals who allege personal bodily injury resulting from the use of Dove, Nexxus, Suave, TRESemme, or Bed Head dry shampoo or foam shampoo Products. Also excluded from this Class is Defendant, any parent companies, subsidiaries, and/or affiliates, officers, directors, legal representatives, employees, co-conspirators, all governmental entities, and any judge, justice or judicial officer presiding over this matter.

59.     Plaintiffs and their counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiffs have retained counsel experienced in complex litigation and class actions. Plaintiffs' counsel has successfully litigated other class action cases

similar to those here and have the resources and abilities to fully litigate and protect the interests of the Class. Plaintiffs intend to prosecute this claim vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class, nor are Plaintiffs subject to any unique defenses.

60.    The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiffs are informed and believe that the proposed Class contains thousands of purchasers of Defendant's Products who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiffs at this time.

61.    Plaintiffs' claims are typical to those of all class members because members of the class are similarly injured through Defendant's uniform misconduct described above and were subject to Defendant's deceptive claims that accompanied each and every Aerosol Antiperspirant Product in Defendant's collection. Plaintiffs are advancing the same claims and legal theories on behalf of herself and all members of the Class.

62.    Plaintiffs' claims raise questions of law and fact common to all members of the Class, and they predominate over any questions affecting only individual Class members. The claims of Plaintiffs and all prospective Class members involve the same alleged defect. These common legal and factual questions include the following:

(a)  whether Defendant's Products contain benzene;

(b)  whether Defendant's omissions are true, or are misleading, or objectively reasonably likely to deceive;

(c)  whether the alleged conduct constitutes violations of the laws asserted;

(d)  whether Defendant's alleged conduct violates public policy;

31

(e)  whether Defendant engaged in false or misleading advertising;

(f)  whether Plaintiffs and the Class members are entitled to

damages and/or restitution and the proper measure of that loss;

and

(g)  whether an injunction is necessary to prevent Defendant from

continuing to market and sell defective and adulterated

Products that contain benzene, a known human carcinogen.

63.  Plaintiffs and their counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiffs have retained counsel experienced in complex litigation and class actions. Plaintiffs' counsel has successfully litigated other class action cases similar to those here, including litigating and settling the J&J sunscreen benzene contamination multi-district litigation. Plaintiffs also have the resources and abilities to fully litigate and protect the interests of the Class. Plaintiffs intend to prosecute this claim vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class, nor are Plaintiffs subject to any unique defenses.

64.  Plaintiffs and their counsel will fairly and adequately protect and represent the interests of each member of the Class. Plaintiffs have retained counsel experienced in complex litigation and class actions. Plaintiffs' counsel has successfully litigated other class action cases similar to those here and have the resources and abilities to fully litigate and protect the interests of the Class. Plaintiffs intend to prosecute this claim vigorously. Plaintiffs have no adverse or antagonistic interests to those of the Class, nor are Plaintiffs subject to any unique defenses.

65.  A class action is superior to the other available methods for a fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by the

Plaintiffs and individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiffs and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Further, it is desirable to concentrate the litigation of the Class members' claims in one forum, as it will conserve party and judicial resources and facilitate the consistency of adjudications. Plaintiffs know of no difficulty that would be encountered in the management of this case that would preclude its maintenance as a class action.

66.     The Class also may be certified because Defendant has acted or refused to act on grounds applicable to the Class, thereby making appropriate final declaratory and/or injunctive relief with respect to the members of the Class as a whole.

67.     Plaintiffs seeks preliminary and permanent injunctive and equitable relief on behalf of the entire Class, on grounds generally applicable to the entire Class, to enjoin and prevent Defendant from engaging in the acts described above, such as continuing to market and sell Products that are adulterated with benzene, and requiring Defendant to provide a full refund of the purchase price of the Products to Plaintiffs and Class members.

68.     Unless a class is certified, Defendant will retain monies received as a result of their conduct that were taken from Plaintiffs and the Class members. Unless a Class-wide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

## COUNT I

## Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201-213

### (On Behalf of Plaintiff Simmons and the Florida Sub-Class)

69.     Plaintiff Simmons and members of the putative Florida Sub-Class incorporate by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

70.     Plaintiff Simmons brings this Count individually and on behalf of the Florida Sub-Class.

71.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") renders unlawful unfair methods of competition, unconscionable acts or practice, and unfair or deceptive acts or practices in the conduct of any trade or commerce. § 501.204, Fla. Stat.

72.     Among other purposes, FDUTPA is intended "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202, Fla. Stat.

73.     As alleged herein, Plaintiffs and members of the putative Florida Sub-Class have suffered injury in fact and lost money as a result of Defendant's conduct because they purchased Products from Defendant in reliance on Defendant's representation that the contents of its Products were safe and effective and were not adulterated with benzene, a known human carcinogen.

74.     As alleged herein, Defendant's actions are deceptive and in clear violation of FDUTPA, entitling Plaintiffs and the Class to damages and relief under Fla. Stat. §§ 501.201-213.

75.     Defendant has engaged, and continues to engage, in conduct that is likely to deceive members of the public. This conduct includes (1) failing to disclose the level of benzene contamination in the recalled Products and (2) failing to disclose whether any of its other non-

recalled dry shampoo and/or foam shampoo products contain benzene, and if so, at what level. This information is important to consumers, including Plaintiffs, because "no safe level of benzene can be recommended"[54] so even "trace amounts" of benzene poses a health risk.[55]

76.    As recognized by the FDA: "The health consequences of benzene exposure depend on the amount, route, and length of time of exposure."[56] The agency noted that even "small amounts" of benzene exposure, such as through inhalation or skin absorption, over extended periods of time "can decrease the formation of blood cells."[57]

77.    The United States Environmental Protection Agency ("EPA") similarly provides standards for the "Maximum Contaminant Level" [MCL] for drinking water, which the EPA defines as "[t]he highest level of a contaminant that is allowed in drinking water."[58] Given its known human carcinogenic risks, the EPA sets the MCL for benzene in drinking water at "zero."[59] Consistent with these guidelines, the National Institute for Occupational Safety and Health ("NIOSH") recommends protective equipment be worn by workers expecting to be exposed to benzene at concentrations of 0.1 ppm and defines "inhalation, skin absorption, ingestion, skin and/or eye contact" as exposure routes.[60]

---

[54] https://www.who.int/ipcs/features/benzene.pdf.

[55] Hudspeth, A., et al., Independent Sun Care Product Screening for Benzene Contamination, Environmental Health Perspectives, 130:3, Online Publication 29 March 2022.

[56] https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.

[57] https://www.fda.gov/drugs/drug-safety-and-availability/frequently-asked-questions-benzene-contamination-drugs.

[58] United States Environmental Protection Agency, 2018 Edition of the Drinking Water Standards and Health Advisories Tables, at p. vi. file:///C:/Users/jrichards/AppData/Local/Microsoft/Windows/INetCache/Content.Outlook/1ADRNMB0/EPA%202018%20Drinking%20Water%20Standards.pdf.

[59] *Id*. at 1.

[60] Centers for Disease Control and Prevention. *The National Institute for Occupational Safety and Health (NIOSH), Benzene* (https://www.cdc.gov/niosh/npg/npgd0049.html).

78.    By committing the acts alleged above, Defendant has engaged in unconscionable, deceptive, or unfair acts or practices, which constitute unfair competition within the meaning of FDUTPA.

79.    Defendant's conduct, including misrepresenting the safety and efficacy of the Products, is substantially injurious to consumers. Plaintiffs have "lost money or property" as required for standing, and such an injury is not outweighed by any countervailing benefits to consumers or competition.

80.    Consumers still do not know what level of benzene detection justified the Defendant's first or second recall notices. They do not know what level of benzene was detected in the Products Plaintiffs' purchased. They do not know any specifics about what type of "testing" was conducted, including by whom. And they do not know whether any of Defendant's *non-recalled* dry shampoo or foam shampoo product still contain benzene—just at levels Defendant itself deems "unlikely" to cause harm. Defendant's self-serving statement in its recall notices that the levels of benzene detected in the recalled Products "would not be expected to cause adverse health consequences" does little to assuage consumers' concerns about the potential health consequences from exposure. As noted, both the medical literature and the FDA have concluded that even "trace amounts" or "small amounts" of benzene exposure poses a health risk.

81.    Because Defendant's misconduct is ongoing and continuing, prospective injunctive relief is necessary. Plaintiffs are frequent and/or long time users of Defendant's Products, and they desire to purchase Defendant's Products in the future if they can be assured that the Products are unadulterated and meet the advertising claims. Absent injunctive relief, Defendant may continue to advertise, promote and sell adulterated Products that deceive the

public as to their characteristics, contents and/or safety. Plaintiffs are thus likely to again be wronged in a similar way. For example, if Plaintiffs or the Class members encounter Defendant's Products in the future and there is a risk those products still contain benzene, Plaintiffs or Class members may mistakenly rely on the Product's label and/or advertising to believe that Defendant eliminated benzene from the Products when Defendant did not.

82.     Because Plaintiffs and Class members reasonably relied on Defendant's labeling and marketing information to disclose what is contained in the Products, and injury resulted from ordinary use of the Products, consumers could not have reasonably avoided such injury.

83.     Florida Statutes, Section 501.204, makes unfair and/or deceptive trade practices in the conduct of any trade or commerce illegal.

84.     Florida Statutes, Section 501.211, creates a private right of action for individuals who are aggrieved by an unfair and/or deceptive trade practice by another person.

85.     Florida Statutes, Section 501.2105, provides that the prevailing party in litigation arising from a cause of action pursuant to Chapter 501 shall be entitled to recover attorney's fees within the limitations set forth therein form the non-prevailing party.

86.     Florida Statutes, Section 501.213, provides that any remedies available under Chapter 501 are in addition to any other remedies otherwise available for the same conduct under state or local law.

87.     Florida Statutes, Section 501.203 (3)(c), states that a person has violated the FDUTPA if he violates "any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices."

88.     Defendant is engaged in the practice of manufacturing, marketing, distributing, selling and otherwise placing into the stream of commerce Products which constitutes trade and

commerce as defined by Sections 501.203(8) Fla. Stat., and is therefore subject to FDUPTA.

89.    As a result of Defendant's unfair and deceptive trade practices, Plaintiffs and the Class members are entitled to an award of attorney's fees pursuant to FDUTPA, Florida Statutes, Section 501.2105, if they prevail.

90.    Wherefore, Plaintiff Simmons and the Florida Sub-Class, pray for judgement against Defendant, as set forth hereafter. Defendant's conduct with respect to the labeling, advertising, marketing, and sale of their Products is unfair because Defendant's conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

91.    In accordance with FDUTPA,[61] Plaintiff Simmons and the Florida Sub-Class, seek an order enjoining Defendant from continuing to conduct business through fraudulent or unlawful acts and practices and to commence a corrective advertising campaign. Defendant's conduct is ongoing and continuing, such that prospective injunctive relief is necessary.

92.    On behalf of Plaintiff Simmons and the Florida Sub-Class, Plaintiffs also seeks an order entitling them and the Class to recover all monies spent on the Defendant's Products, which were acquired through acts of fraudulent, unfair, or unlawful competition.[62]

93.    Wherefore, Plaintiff Simmons and the Florida Sub-Class are entitled to injunctive and equitable relief, and a full refund in the amount they spent on the Defendant's Products.

## COUNT II

## Negligent Misrepresentation/Omission

---

[61] Section 501.211(1) allows "anyone aggrieved by a violation of" FDUTPA to seek declaratory or injunctive relief. Fla. Stat. §501.211.

[62] Section 501.211(2) provides that "a person who has suffered a loss as a result of a [FDUTPA] violation ... may recover actual damages . . . ."

**(On Behalf of the Nationwide Class and All State Classes)**

94.     Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

95.     Through its labeling and advertising, Defendant made representations to the Plaintiffs and the Class members concerning the content of its Products.

96.     Defendant has a duty to provide accurate information to consumers with respect to the contents of its Products as detailed above.

97.     Defendant failed to fulfill their duty to accurately disclose, through its labeling, advertising or otherwise, that its Products contain benzene or may contain benzene.

98.     Additionally, Defendant has a duty to not make false representations with respect to its Products.

99.     Defendant failed to fulfill this duty when it made false representations regarding the quality and safety of the Products as detailed above.

100.    Such failures to disclose on the part of Defendant amount to negligent omission and the representations regarding the quality and safety of the product amount to negligent misrepresentation.

101.    Defendant's conduct constitutes fraud in the inducement in that it occurred in connection with misrepresentations, statements or omissions which caused the Plaintiffs and putative Class members to enter into a transaction (i.e. to purchase Defendant's Products). As such, Defendant's fraudulent activities occurred independent of the contract to purchase.

102.    Plaintiffs and the other members of the Class reasonably relied upon such representations and omissions to their detriment.

103.    By reason thereof, Plaintiffs and the other Class members have suffered damages

in an amount to be proven at trial.

## COUNT III

## Strict Product Liability – Failure to Warn

## (On Behalf of the Nationwide Class and All State Classes)

104.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

105.    Defendant knew or should have known that its Products contained benzene, which is a known carcinogen.

106.    Defendant had a duty to warn Plaintiffs and the Class about the presence of benzene in its Products.

107.     In addition, Defendant had a duty to warn Plaintiffs and the Class about the dangers of the presence of benzene in its Products.

108.    Defendant knew that the risk of exposure to benzene from use of its Products was not readily recognizable to an ordinary consumer and that consumers would not inspect the product for benzene content.

109.    Defendant did not warn Plaintiffs and the Class that the Products contained benzene or about the dangers of the presence of benzene in their Products.

110.    Defendant failed to fulfill this duty when it made affirmative representations regarding the quality and safety of the Products as detailed above. Such affirmative representations regarding the safety of the Products constitute negligent misrepresentations which are independent of Plaintiffs' economic losses.

111.    Plaintiffs and other Class members have lost time finding alternative dry shampoo and/or foam shampoo products.

112.    Plaintiffs and the Class have suffered damages by purchasing Products in a manner promoted by Defendant, and in a manner that was reasonably foreseeable by Defendant. Plaintiffs and the members of the Class would not have purchased Defendant's Products, or they would have paid less for them, had they known they contained, or may contain, benzene.

113.    Plaintiffs and the Class were justified in their reliance on Defendant's labeling and advertising of the Products for use as dry shampoo and foam shampoo.

114.    By reason thereof, Plaintiffs and the Class have suffered damages in an amount to be proven at trial.

## COUNT IV

### Strict Product Liability – Manufacturing Defect

### (On Behalf of the Nationwide Class and All State Classes)

115.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

116.    The Products contained a manufacturing defect when they left the possession of Defendant. Specifically, the Products differ from Defendant's intended result or from other lots of the same product line because they contain benzene.

117.    Plaintiffs and members of the Class used the Products in a way that was reasonably foreseeable to Defendant.

118.    As a result of the defects in the manufacture of the Products, Plaintiffs and the Class suffered damages in an amount to be proven at trial.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated, prays for judgment against the Defendant as to each and every count, including:

A.    An order declaring this action to be a proper class action, appointing Plaintiffs and their counsel to represent the Class/Sub-Classes, and requiring Defendant to bear the costs of class notice;

B.    An order enjoining Defendant from selling the Products;

C.    An order enjoining Defendant from suggesting or implying that they are safe and effective for human application;

D.    An order requiring Defendant to engage in a corrective advertising campaign and engage in any further necessary affirmative injunctive relief, such as recalling all Products contaminated with benzene;

E.    An order awarding declaratory relief, and any further retrospective or prospective injunctive relief permitted by law or equity, including enjoining Defendant from continuing the unlawful practices alleged herein, and injunctive relief to remedy Defendant's past conduct;

F.    An order requiring Defendant to pay restitution/damages to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, untrue or misleading advertising in violation of the above-cited authority, plus pre- and post-judgment interest thereon;

G.    An order requiring Defendant to disgorge any ill-gotten benefits received from Plaintiffs and members of the Class/Sub-Classes as a result of any wrongful or unlawful act or practice;

H.    An order requiring Defendant to pay all actual and statutory damages permitted under the counts alleged herein;

I.      An order awarding attorneys' fees and costs to Plaintiffs and the Class/Sub-

Classes; and

J.      An order providing for all other such equitable relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.


DATED: November 17, 2022.


By:  R. Jason Richards
AYLSTOCK, WITKIN, KREIS & OVERHOLTZ, PLLC
R. JASON RICHARDS (FL Bar # 18207)
BRYAN F. AYLSTOCK (FL Bar # 0078263)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-mail: jrichards@awkolaw.com
        baylstock@awkolaw.com

*Attorneys for Plaintiffs*